10 CIV 4429

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

GOLDMAN, SACHS & CO., GOLDMAN SACHS MORTGAGE COMPANY, GS MORTGAGE SECURITIES CORP., DANIEL L. SPARKS, MICHELLE GILL, and KEVIN GASVODA,

Defendants.

Case No.

CLASS ACTION COMPLAINT

TRIAL BY JURY DEMANDED




## I. INTRODUCTION

1. This is a securities class action on behalf of all persons or entities who acquired the GSR Mortgage Loan Trust 2007-4F Mortgage-Backed Certificates (collectively, the "Certificates") of defendant GS Mortgage Securities Corp. ("GS Mortgage") pursuant and/or traceable to a false and misleading Registration Statement filed January 31, 2007, a false and misleading Prospectus dated February 13, 2007 and two false and misleading Prospectus Supplements dated June 27 and July 2, 2007, each of which were expressly incorporated by reference into the Registration Statement (collectively, the "Offering Documents"), as well as two Prospectus Supplements dated June 18, 2008 and May 19, 2009. This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2. The Certificates were issued, underwritten and/or offered for sale by the defendants. The Certificates are securities backed by pools of residential real estate loans. Defendants caused the Offering Documents to contain materially false and misleading statements and omissions concerning the Certificates, and the loans underlying them, in violation of the 1933 Act.

3. In summary, defendants made the following false and misleading statements in the Offering Documents:

- The loans supporting the Certificates were originated using underwriting standards that evaluated a prospective borrower's ability to repay the loan;
- Property appraisers' compensation was not affected by whether or not a loan was approved; appraisals of the properties underlying the loans were based on recent sales of comparable properties; and the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP"), Fannie Mae or Freddie Mac standards;
- Documents submitted in connection with the loan underwriting process were not falsified, did not contain untrue statements and were free of fraud;
- The loans underlying the Certificates had certain, specific, loan-to-value ("LTV") ratios; and
- The Certificates had "investment grade" credit ratings.

4. The true, material facts, which defendants omitted from the Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify borrowers for loans they could not afford to repay;
- Property appraisers' future compensation was contingent upon providing loan originators with predetermined, inflated property appraisals that

allowed borrowers to qualify for loans; in addition, appraisals were not based on recent sales of comparable properties; and appraisals did not conform to USPAP, Fannie Mae or Freddie Mac standards;

- Documents submitted for loan underwriting contained untrue and false statements because potential borrowers and loan originators inflated borrowers' incomes and appraisers submitted falsely inflated property appraisals;

- Because the specified LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated;

- The credit ratings of the Certificates were inaccurate and understated the investment risk associated with the Certificates because the rating agencies used outdated assumptions, overly-relaxed rating criteria and inaccurate data in formulating the ratings; and

- At the same time defendants were selling the Certificates to plaintiff and the Class, and representing that the Certificates were "investment grade", defendants were in essence betting against the success of the certificates by engaging in credit default swaps and other investments that were based on the expectation that loans like those underlying the Certificates would not be repaid.

5. As a result of these omissions and false and misleading statements, the Certificates sold to plaintiff and the Class had a much greater risk profile than represented in the Offering Documents. Instead of being conservative "investment grade" products as defendants represented in the Offering Documents, the Certificates were extremely risky investments that should have actually been rated as "junk."

6. By mid-2008, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public. Information was released indicating that the Certificates were much riskier than originally represented and that holders would likely receive less absolute cash flow in the future and receive it, if at all, on a untimely basis. The credit rating agencies however, did not act upon these reports until mid-2009 at which point they put negative

watch labels on the Certificates and downgraded previously-assigned ratings. At present, the Certificates plaintiff bought have been downgraded from "AAA" investment grade at the time of purchase to "CCC" junk grade investments. As an additional result, the Certificates are no longer marketable in the secondary market at prices anywhere near the prices paid by plaintiff and the Class, and the holders of the Certificates are exposed to much more risk than the Offering Documents represented with respect to both the timing and absolute cash flow to be received.

## II. JURISDICTION AND VENUE

7. The claims alleged herein arise under §§ 11 and 15 of the 1933 Act, 15 U.S.C. §§ 77k and 77o. Jurisdiction is conferred by § 22 of the 1933 Act and venue is proper pursuant to § 22 of the 1933 Act.

8. The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

## III. PARTIES

9. Plaintiff The Police and Fire Retirement System of the City of Detroit acquired Certificates pursuant and traceable to the Offering Documents and has been damaged thereby. Specifically, on June 15, 2007, plaintiff purchased Mortgage-Backed Certificates, Class 6A-1, from the GSR Mortgage Loan Trust 2007-4F (the "Trust"), with a face value of $1,800,000.00. Plaintiff sold the Certificates it purchased on October 5, 2009 for a loss of $165,877.05.

10. Defendant Goldman Sachs & Co. ("Goldman Sachs") is a global bank holding company that engages in investment banking, securities and investment management. Goldman Sachs was an underwriter in the sale of the Certificate offering listed in paragraph 18 below. Defendant Goldman Sachs helped to draft and disseminate the Offering Documents.

11. Defendant Goldman Sachs Mortgage Company ("GSMC") is a wholly owned subsidiary of defendant Goldman Sachs. GSMC purchased the loans underlying the Certificates from various loan originators and other third-parties. GSMC is the "sponsor" of the Certificate offering at issue in this action and made certain representations concerning the loans within the Trust at issue herein.

12. Defendant GS Mortgage is a wholly owned subsidiary of defendant GSMC. GS Mortgage engages in securitizing mortgage assets and related activities. GS Mortgage securitized the loans at issue in this action, and was the "depositor" and issuer of the Certificates. GS Mortgage issued the Certificates to plaintiff through a New York common law trust. GS Mortgage issued over $790 million worth of Certificates pursuant to the Registration Statement, Prospectus and Prospectus Supplements through the Trust. In connection with the sale of Certificates for the Trust, defendants issued a Prospectus dated February 13, 2007 and Prospectus Supplements, dated June 27 and July 2, 2007 and filed on July 2 and July 3, 2007 respectively.

13. Defendant Daniel L. Sparks ("Sparks") was Chief Executive Officer ("CEO") and a director of GS Mortgage during the relevant time period. Sparks was also overseeing defendant Goldman Sachs's credit-default swap and other activities alleged herein, betting against the residential housing market at the same time defendants were offering the Certificates at issue here to plaintiff and the Class. Defendant Sparks signed the January 31, 2007 Registration Statement.

14. Defendant Michelle Gill ("Gill") was Vice President, and the Principal Accounting Officer of GS Mortgage during the relevant time period. Defendant Gill signed the January 31, 2007 Registration Statement.

15. Defendant Kevin Gasvoda ("Gasvoda") was a director of GS Mortgage during the relevant time period. Defendant Gasvoda signed the January 31, 2007 Registration Statement.

16. The defendants identified in ¶¶ 13-15 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trust and to GS Mortgage.

17. The Individual Defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## IV. CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action as a class action alleging violations of Sections 11 and 15 of the Securities Act, on behalf of a class consisting of all persons who purchased or acquired the Certificates (the "Class") pursuant and/or traceable to the Offering Documents issued in connection with the Offering from the effective date through the date of the filing of this action. Included in the Class are (a) all those who have sold their certificates or who sell their Certificates prior to the final judgment in this action; and (b) all those who retain their Certificates. Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded entity or individual.

19. The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can

be ascertained from the books and records of Goldman Sachs GSMC, GS Mortgage or their transfer agent or the underwriters for the Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

20. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and to prosecute this action vigorously.

21. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all of the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

22. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

23. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b) Whether the Offering Materials issued by Defendants to the investing public omitted and/or misrepresented material facts; and

(c) The extent of injuries sustained by the Class and the appropriate measure of damages.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Defendants Misrepresented that The Originators Evaluated the Borrowers' Ability to Repay The Loans

24. The mortgage pool for the Trust consists of 1,414 mortgage loans with an aggregate scheduled principal balance as of June 1, 2007 of approximately $790,100,742. The loans are divided into two groups, "Loan Group 1," with an aggregate scheduled principal balance of $707,936,373 and "Loan Group 2" with and aggregate scheduled principal balance of $82,164,370. All of the mortgage loans are secured by residential properties. The January 31, 2007 Offering Documents for the Trust indicate that GSMC acquired loans for the Trust through the Conduit Program and by bulk acquisitions in the secondary market. Under the Conduit Program, GSMC acquired loans from a variety of banks, savings and loans associations, mortgage bankers and other mortgage loan originators and purchasers of loans in the secondary market.

25. The Offering Documents state that the loan originators evaluated the borrowers based on their ability to repay the loans. For example, the Registration Statement and Prospectus represent that, "the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property." The Registration Statement and Prospectus also represent that "[t]he lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's ... repayment ability" and that "the lender makes a determination as to whether the prospective borrower has sufficient monthly income available (as to meet the borrower's monthly obligations on the

proposed mortgage loan and other expenses related to the mortgaged property such as property taxes and hazard insurance)." The Registration Statement and Prospectus further represent that certain other types of loans "are underwritten on the basis of a judgment that mortgagors or obligors will have the ability to make the monthly payments required initially."

26. The Prospectus Supplement dated June 27, 2007 (the "June 27 Prospectus Supplement") contains nearly identical language: "the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan" (June 27 Prospectus Supplement, p. S-47).

27. Contrary to the representations in the Offering Documents, neither defendants Goldman Sachs, GSMC, GS Mortgage, nor the loan originators, employed standards aimed at determining whether borrowers' income was sufficient to meet the loan payments. Nor did they evaluate the borrowers' ability to repay their loans. The actual underwriting practices were in direct contradiction to the conservative practices represented in the Offering Documents, rendering the Offering Documents false and misleading. In fact, the foregoing defendants were investigated by Martha Coakley, the Massachusetts Attorney General ("Massachusetts AG") concerning such activities. Defendants settled with the Commonwealth of Massachusetts for $10 million. The terms of the settlement also required Defendants to forgive all or a portion of the balances on certain loans they bought and securitized at an additional cost of tens of millions of dollars. The aforementioned investigation was a result of the same course of conduct alleged in this action, namely failing to determine if loans complied with originators' underwriting guidelines, failing to prevent bad loans from entering the securitization pools, failing to provide accurate information, and failing to fully inform investors about problem loans in the Trust.

Goldman Sach's, GSMC's and GS Mortgage's settlement agreement with Massachusetts is attached hereto as Exhibit A.

28. At the time the loans were originated and transferred to the Trust, the originators did not review loan applications to determine whether the borrowers' income was sufficient to meet their monthly payment obligations. Rather, the originators extended mortgages to borrowers without regard to their ability to pay their mortgage obligation. This conduct resulted in originators:

(a) Coaching borrowers to falsely inflate their income on loan applications to appear to qualify for mortgage loans the borrowers could not afford to repay;

(b) Falsely inflating prospective borrowers' incomes to qualify the borrowers for loans they could not afford to repay;

(c) Steering borrowers to loans that exceeded their borrowing capacity;

(d) Encouraging borrowers to borrow more than they could afford by guiding them to "stated income" loans. These loans, aptly called "liar loans", were loans on which the borrowers could simply make up, or "state," inflated incomes that would not be verified;

(e) Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the payment when the loan rate adjusted; and

(f) Approving non-qualifying borrowers for loans they could not afford under exceptions to the underwriting standards.

29. As a result, borrowers who were required to submit income information routinely inflated their income substantially above their actual income and not corresponding to their stated job titles. Through these false statements, borrowers obtained loans that they could not afford to repay. As a result, the loans within the Trust are defaulting at sky high rates. The false inflation of income in stated income loans was systematic and commonplace. A study cited by Mortgage Asset Research Institute found that almost all stated income loans exaggerated the

borrower's actual income by at least 5%, and more than half increased the amount by more than 50%.

30. Approximately 20% of the loans in the Trust were "stated income" loans.

**B. The Loan Originators**

31. The Loan Originators are Countrywide Home Loans Servicing, LP, National City Mortgage Co., Washington Mutual Bank and Goldman Sachs Mortgage Conduit Program as well as SunTrust Mortgage Inc. and American Mortgage Network. The defendants' issued Offering Documents misrepresented and omitted material facts regarding the underwriting practices of each of these Loan Originators.

**1. Countrywide Home Loans Servicing, LP**

32. Countrywide Home Loans Servicing, LP ("Countrywide") originated and serviced 80.6% of the loans in the collateral group underlying plaintiff's Certificates. Countrywide originated approximately 8% of loans in the Trust and 75% of the loans in Loan Group 2. The Prospectus Supplements misrepresented and omitted material facts regarding the underwriting practices of Countrywide.

33. With regard to Countrywide's underwriting guidelines, the June 27 Prospectus Supplement states:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

(June 27 Prosp. Supp., p. S-52)

34. While the Offering Documents represented that Countrywide designed its underwriting guidelines of mortgages to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, these statements were untrue and omitted material facts. Indeed, Countrywide's underwriting standards were designed to originate as many mortgage loans as possible without regard to the ability of the borrower to repay such mortgages. Countrywide's loan originators systematically disregarded and/or manipulated the income, assets, and employment status of borrowers seeking mortgage loans.

35. On June 4, 2009, the SEC filed a complaint against Angelo Mozilo, David Sambol and Eric Sieracki, Countrywide's three most senior executives from 2005 through 2007. On November 3, 2009, the court denied the defendants' motion to dismiss the complaint. The SEC's complaint alleges that Messrs. Mozilo, Sambol and Sieracki misled investors by failing to disclose:

- The increasingly lenient underwriting guidelines used by Countrywide in originating loans;
- Countryside's pursuit of a "matching strategy" in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;
- The high percentage of loans Countrywide originated were outside its own already widened underwriting due to loans made as exceptions to guidelines;
- Countrywide's definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;
- The high percentage of Countrywide's subprime originations that had a loan to value ratio of 100%, for example, 62% in the second quarter; and

- Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

36. Indeed, when discussing the availability of stated income loans at Countrywide, a former manager stated that, "if you had a pulse, we gave you a loan." He further explained that these loans were "an invitation to lie" because the loan officers told the prospective borrower that they would not verify the borrower's stated assets or income.

37. Several states' Attorneys General investigated Countrywide's lending practices and alleged that Countrywide systematically departed from its stated underwriting standards. For example, the Illinois Attorney General investigated Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled The People of the State of Illinois v. Countrywide Financial Corporation, et al., No. 080122994 (the "Illinois AG Complaint").

38. According to the Illinois AG Complaint, Countrywide employees stated that Countrywide employees were incentivized to increase the number of loan originations without concern for whether the borrower was able to repay the loan, which resulted in routine loan originations that were not in compliance with Countrywide's underwriting guidelines. With respect to stated income loans, while the company had a "reasonableness standard" in order to check fraudulent stated income, employees used their judgment to decide if a stated income loan was reasonable. To supplement an employee's judgment as to whether a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its employees to use a website, www.salary.com, to determine if a potential borrower's stated income was reasonable. However, if the stated salary was outside of the range provided by the website, the Countrywide

employee could still approve the loan. The Illinois AG Complaint contends that the foregoing "reasonableness" test contravened proper underwriting practices.

39. The Illinois AG Complaint also alleges that Countrywide employees deviated from underwriting guidelines with regards to stated income loans and as a result did not make a proper determination about the borrower's qualifications. Further, many of Countrywide's stated income loans were based on inflated estimates of borrowers' income. For example, according to the Illinois AG Complaint: (1) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (2) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely *doubled* the amount of the potential borrower's income on stated income mortgage applications.

40. The California Attorney General also investigated Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, captioned *The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846 (the "California AG Complaint"). As with the Illinois AG Complaint, the California AG Complaint alleged that Countrywide deviated from its stated underwriting guidelines. For example, it alleged that due to pressure to issue loans to unqualified borrowers, employees routinely made exceptions to underwriting standards, including the failure to verify the borrower's documentation.

41. According to the California AG Complaint, Countrywide used a system called CLUES, or Countrywide Loan Underwriting Expert System, to analyze if the loan met Countrywide's underwriting guidelines. The CLUES report, however, was only a recommendation, if it indicated that the loan did not comply with Countrywide's stated underwriting guidelines, employees often overrode the system and approved the loan.

42. The California AG Complaint alleged that Countrywide employees used www.salary.com to purportedly confirm a borrower's stated income. It also alleged that loan officers used this knowledge to determine how much to inflate their potential borrower's income. A former California loan officer for Countrywide further explained that its loan officers coached borrowers into stating their income at a level that could guarantee approval. For example, they might explain to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make." The borrower took the hint and stated that he or she made X amount of income.

43. Likewise, the Connecticut Attorney General (the "Connecticut AG") filed a complaint in Superior Court, Judicial District of Hartford, entitled State of Connecticut v. Countrywide Financial Corporation, et al., No. CV08-40390945 (the "Connecticut AG Complaint") alleging that Countrywide's employees inflated borrowers' incomes in order to qualify them for loans they otherwise would not have received.

44. Many of the allegations in the Illinois, California and Connecticut AG complaints were confirmed by investigations in other states such as Washington, West Virginia, Indiana and Florida. Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by 11 states, including California and Illinois, for an estimated $8.4 billion.

45. Countrywide's underwriting standards are also the subject of an investigation by the Federal Bureau of Investigation ("FBI"), which The Wall Street Journal first reported on March 8, 2008, in an article entitled "FBI Investigates Countrywide — U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud." According to the article, the FBI investigation is focused on "whether company officials made misrepresentations about the company's financial position and the quality of its mortgage loans in securities filings."

46. On March 11, 2008, The Wall Street Journal published another article detailing the FBI investigation. According to its sources, federal investigators found that "Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients, according to people involved in the matter. The company packaged many of those mortgages into securities and sold them to investors, raising the additional question of whether Countrywide understated the risks such investments carried."

47. Countrywide routinely ignored its stated underwriting standards in favor of an unwritten policy to originate as many mortgage loans as possible without regard to the ability of its borrowers to repay such mortgages. Instead of determining if a borrower would be able to repay, it focused on the amount of fees it could generate from making loans and then selling them to Wall Street firms such as defendants. These practices were completely at odds with what defendants represented in the Offering Documents and render the Offering Documents false and misleading.

## 2. National City Mortgage Co.

48. The June 27 Prospectus Supplement states that National City Mortgage Co. ("National City") originated 8.34% of the loans in the mortgage pool. The Prospectus Supplement misrepresented and omitted material facts regarding the underwriting practices of National City.

49. With regard to National City's underwriting guidelines, the June 27 Prospectus Supplement states:

> National City's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. These standards are applied in accordance with the applicable federal and state laws and regulations. Exceptions to the underwriting standards are permitted where compensating factors are present. Generally, each mortgagor will have

been required to complete an application designed to provide to the lender pertinent credit information concerning the mortgagor. The mortgagor will have given information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and will have furnished the lender with authorization to obtain a credit report which summarizes the mortgagor's credit history. In the case of investment properties and two-to four unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.

* * *

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligation on the proposed mortgage loan, the originator generally considers, when required by the applicable documentation program, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratios vary depending on a number of underwriting criteria, including loan-to-value ratios, and are determined on a loan-by-loan basis. The originator also examines a prospective borrower's credit report. Generally, each credit report provides a credit score for the borrower. Credit scores generally range from 350 to 840 and are available from three major credit bureaus: Experian (formerly TRW Information Systems and Services), Equifax and Trans Union. If three credit scores are obtained, the originator applies the lower middle score of all borrowers. Credit scores are empirically derived from historical credit bureau data and represent a numerical weighing of a borrower's credit characteristics over a two-year period. A credit score is generated through the statistical analysis of a number of credit-related characteristics or variables. Common characteristics include number of credit lines (trade lines), payment history, past delinquencies, severity of delinquencies, current levels of indebtedness, types of credit and length of credit history. Attributes are the specific values of each characteristic. A scorecard (the model) is created with weights or points assigned to each attribute. An individual loan applicant's credit score is derived by summing together the attribute weights for that applicant.

* * *

Each mortgaged property securing a Mortgage Loan has been appraised by a qualified independent appraiser. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The

> requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition and verify that construction, if new, had been substantially completed. The appraisal generally will have been based on prices obtained on recent sales of comparable properties, determined in accordance with Fannie Mae and Freddie Mac guidelines. In certain cases an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property may be used.
>
> (June 27 Prosp. Supp., pp. S-65 through S-67).

50. While the Offering Documents represented that National City's underwriting was designed to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and material omissions. National City's systematic practice of extending credit without regard to the income, assets, and employment status of borrowers cost the company over half a billion dollars.

51. According to a February 12, 2008 article in the Cleveland Plain Dealer, entitled "How National City's Mortgage Division Lost Half A Billion Dollars", National City lent money without regard to whether the borrower could ultimately pay off the loan. They lent money to anybody who applied for a mortgage, including single people buying their first house, families making the move to a bigger house, people with lousy credit, and homeowners who needed extra money from an equity line. National City's home-equity division specialized in risky second mortgages known as piggyback loans.

52. According to the Cleveland Plain Dealer article, by all accounts "National City got into one of the riskiest businesses way too deep." As of February 12, 2008, National City had an estimated $17 billion in risky loans on its books that it was unable to sell to the secondary market, including $6 billion in subprime loans from First Franklin.

53. In 1999, National City purchased First Franklin Financial Corporation ("First Franklin"), a now infamous subprime lender that consistently ignored underwriting guidelines, and used inflated appraisals to value the real estate underlying many of its loans. By 2003, National City ranked number 6 in the nation in lending volume with over $130 billion in mortgages.

54. On June 30, 2008, National City was notified that the Chicago Regional Office of the SEC was conducting an informal investigation of National City and requested that it provide the SEC with certain documents concerning its loan underwriting experience, dividends, bank regulatory matters and the sale of First Franklin. These practices showed a blatant disregard for the underwriting practices stated in the Offering Documents and rendered the Offering Documents false and misleading.

### 3. Goldman Sachs Mortgage Conduit Program

55. The June 27 Prospectus Supplement stated that the Sponsor acquired approximately 1% of the underlying mortgage loans from various other loan originators under the Goldman Sachs Mortgage Conduit Program ("GS Conduit Program"). The June 27 Prospectus Supplement misrepresented and omitted material facts regarding the GS Conduit Program.

56. The June 27 Prospectus Supplement stated that:

> The underwriting guidelines used to originate certain of the mortgage loans acquired by GSMC through the Conduit Program are different from and, in some cases, less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac. The differences primarily relate to loan characteristics such as original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. Mortgage loans originated pursuant to underwriting standards different from those of Fannie Mae and Freddie Mac may experience higher rates of delinquency and/or credit losses than mortgage loans originated by Fannie

Mae or Freddie Mac. In addition, compensating factors demonstrated by a prospective borrower may warrant certain exceptions to the underwriting standards described in this section.

Generally, each borrower applying for a mortgage loan must complete a credit application. The credit application is designed to provide the originating lender with relevant credit information about the prospective borrower such as information with respect to the borrower's assets, liabilities, income (except as described below), credit history, employment history and personal information. In addition, prospective borrowers generally must provide an authorization to apply for a credit report. A credit report summarizes the borrower's past credit experience with lenders and other debtors, including any record of bankruptcy. Sometimes, the borrower is required to authorize the originating lender to verify deposits at financial institutions identified by the borrower as institutions at which the borrower maintains demand or savings accounts. The originating lender may also consider certain non-wage income of the borrower in the underwriting process, including income derived from mortgaged properties that are investment properties or two- to four-unit dwellings. Generally, the originating lender will not consider income derived from vacation or second homes in the underwriting process. Certain borrowers with acceptable payment histories are not required to state their income on their loan application and, as a result, the originating lender does not verify their income.

Based on the data referred to above (and verification of that data, to the extent required), the originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed and revolving obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first twelve months of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months may equal no more than a specified percentage of the prospective borrower's gross income. The permitted percentage is determined on the basis of various underwriting criteria, including the LTV ratio of the mortgage loan and, in certain instances, the amount of liquid assets available to the borrower after origination.

In addition to its "full" documentation program, loans acquired by GSMC through the Conduit Program may also be originated under the following limited documentation programs: "reduced income," "stated income," "stated income/stated assets" or "no doc." These limited documentation programs are designed to streamline the underwriting process.

> The "reduced income," "stated income," "stated income/stated asset" and "no doc" programs generally require less documentation and verification than do "full" documentation programs.
>
> Generally, the "full" documentation program requires information with respect to the borrower's income and assets (i.e., standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories). However, alternative forms of standard verifications may also be used for income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements). Generally, under "full" documentation programs at least one year of income documentation is provided. Employment history must also be verified by the originating lender.
>
> Generally, the "reduced" documentation program requires similar information with respect to the borrower's income as a "full" documentation program. However, under "reduced" documentation programs only six months of income documentation is generally provided. Employment history must also be verified by the originating lender.
>
> Generally, under the "stated income" program, the borrower's income is stated on the credit application but not verified by the originator. However, employment history must be verified by the originating lender. Generally, under the "stated income/stated assets" program, both income and assets are stated on the loan application, but the originator verifies neither; although the stated income must be reasonable relative to the borrower's stated employment. However, employment history must be verified by the originating lender.
>
> Generally, under the "no doc" program, the borrower's income and assets are neither stated on the credit application nor verified by the originator. The underwriting for mortgage loans originated under a "no doc" program may be based primarily or entirely on the appraised value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score of the related borrower. Employment history is neither stated nor verified by the originating lender.
>
> (June 27 Prosp. Supp., pp. S-46 through S-48).

57. While the Offering Documents represented that substantially all of the underlying mortgages acquired through the GS Conduit Program were underwritten to ensure a prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral, the Offering Documents contained untrue statements of material fact and

material omissions. The statements were false and misleading because, in truth, the GS Conduit Program failed to implement controls to prevent it from acquiring defective loans.

58. Goldman Sachs omitted facts from the offering documents (such as information regarding underwriting, quality control, due diligence, approval and funding practices and policies for the mortgage loans and the likelihood and ability of borrowers to repay the mortgage loans). Such omissions are the subject of a recently-settled investigation by the Massachusetts AG.

59. On May 7, 2009, Goldman Sachs, on behalf of itself and its affiliates, the Sponsor and the Depositor, entered into a settlement agreement with the Massachusetts AG in order "[t]o resolve any potential claims stemming from the Attorney General's investigation." Under the terms of the agreement, "Goldman [Sachs] has agreed to provide loan restructuring valued at approximately $50 million to Massachusetts subprime borrowers . . . [and] make a $10 million payment to the Commonwealth."

60. The investigation examined whether banks, including Goldman Sachs, engaged in the following practices:

- Facilitated the origination of "unfair" loans under Massachusetts law;
- Failed to ascertain whether loans purchased from originators complied with the originator's stated underwriting guidelines;
- Failed to take sufficient steps to avoid placing problem loans in securitization pools;
- Been aware of allegedly unfair or problem loans;
- Failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and
- Failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan due diligence and the pre-securitization process, as

well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

### C. Defendants Misrepresented That: (1) Appraisers' Compensation Was Not Affected by Approval or Disapproval of the Loans; (2) Appraisals were Performed in Conformity with USPAP; (3) Appraisals Conformed to Fannie Mae or Freddie Mac Standards; and/or (4) Appraisals were Based on Recent Sales of Comparable Properties

61. The June 27 Prospectus Supplement represents that "the Mortgage Loan documents contain an appraisal of the related Mortgaged Property by an appraiser who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof; and whose compensation was not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and/or the appraiser satisfy the applicable requirements or minimum qualifications of FIRREA, Fannie Mae or Freddie Mac, as applicable" (June 27 Prosp. Supp., p. S-74).

62. The June 27 Prospectus Supplement also states, that "all appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation" and that "the appraisal generally will be based upon a market data analysis of recent sales of comparable properties…" (June 27 Prosp. Supp., p. 32).

63. The foregoing representations in ¶61, that appraisals were done by qualified appraisers "whose compensation is not affected by the approval or disapproval of the Mortgage Loan," were false and misleading. Appraisers were ordered by loan originators to give pre-determined, inflated appraisals that would result in approval of the loan. If the appraiser objected to the inflated appraisal number, they would be threatened with being black-balled within the industry. Appraisers were frequently threatened by being told to provide a predetermined appraisal value justifying a loan or face never doing business again. Thus,

contrary to representations in the Offering Documents, appraisers' compensation was in fact affected by whether or not a loan was approved.

64. In addition, the representations in ¶62 that "all appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice [USPAP]" were false and misleading because the appraisals did not conform to either the USPAP, Fannie Mae or Freddie Mac standards. This was so because the USPAP required that:

(a) An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b) In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c) An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d) It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i) The reporting of a predetermined result (e.g., opinion of value);

(ii) A direction in assignment results that favors the cause of the client;

(iii) The amount of a value opinion;

(iv) The attainment of a stipulated result; or

(v) The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

65. Furthermore, both Fannie Mae and Freddie Mac standards required that appraisals comply with the USPAP and that appraisers not be influenced in any way to provide a particular result.

66. The representations that appraisals conformed to USPAP, Fannie Mae or Freddie Mac standards, were materially false and misleading because, contrary to the USPAP, Fannie

Mae and/or Freddie Mac standards, appraisers were ordered to come back with pre-determined, preconceived, inflated and false appraisal values.

67. Most lenders allowed the sales personnel or account executives to order and control appraisals. These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible at the highest possible loan amounts. These sales personnel and account executives would pressure appraisers to appraise properties at pre-set, artificially high levels to justify the loans the lenders wanted to make. If appraisers did not comply with the lenders' demands, the appraisers would not be hired again.

68. This dynamic caused appraisers to experience systemic problems of coercion, as many were ordered to doctor their reports or face never seeing work from lenders again. Appraisers were routinely threatened with being put on exclusionary "do-not-use" lists. This pressure succeeded in generating false, artificially inflated appraisals of the properties connected to the loans in the Trust.

69. A 2007 survey of 1,200 appraisers conducted by October Research Corp. — a firm in Richfield, Ohio that publishes Valuation Review — found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. The study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."

70. In 2009, 11,000 appraisers submitted a signed petition to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the of United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment

according to uniform high professional standards and ethics." In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and certified real estate appraisers in the United States, who seek your assistance in solving a problem facing us on a daily basis. Lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value.
>
> This pressure comes in many forms and includes the following:
>
> - the withholding of business if we refuse to inflate values,
> - the withholding of business if we refuse to guarantee a predetermined value,
> - the withholding of business if we refuse to ignore deficiencies in the property,
> - refusing to pay for an appraisal that does not give them what they want,
> - black listing honest appraisers in order to use "rubber stamp" appraisers, etc.
>
> We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

71. The practices of the above-mentioned originators as well as other originators of the loans in the Trust, including SunTrust Mortgage Inc., Washington Mutual Bank and American Mortgage Network, fell woefully short of the underwriting standards represented in

the Offering Documents.[1] Underwriting standards are material because they go to the heart of the quality and risk characteristics of the investment. The representations about the underwriting standards of the originators in the Offering Documents were false and misleading as described in detail above because the originators engaged in practices that were not focused on the ability of borrowers to repay, but on generating large volumes of loans, which belied the practices and motivations represented in the Offering Documents.

### D. Defendants Misrepresented that the Loan Documents Were Not Falsified and Did Not Contain Any Untrue Statements

72. The January 31, 2007 Registration Statement represented that loan originators had warranted the following:

> The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated in them or necessary to make the information and statements in the documents, instruments and agreements not misleading. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a mortgage loan has taken place on the part of any person, (including without limitation, the mortgagor, any appraiser, any builder or developer,

[1] Washington Mutual Bank ("WaMu") underwrote 15.04% of the loans in the Trust. WaMu was underwriter and servicer for 5.95% of the loans in the collateral group underlying plaintiff's Certificates. The Offering Documents misrepresented and omitted material facts regarding the underwriting practices of WaMu. GSMC represented that "all the documents executed in connection with the Mortgage Loan including, but not limited to, the mortgage note and the Mortgage, are free of fraud and any misrepresentation" (June 27 Prospectus Supplement at S-71). However, an investigation by the Senate Permanent Subcommittee on Investigations (the "Subcommittee") found fraud prevalent in WaMu's underwriting practices. The Subcommittee has been investigating WaMu since its collapse in September of 2008. Senator Carl Levin, the chair of the Subcommittee stated that "the bottom line is that WaMu had poor policies, poor controls, inadequate oversight of its loans, it turned out toxic mortgages that sunk the bank, devastated homeowners and polluted the financial system like a poison." Sen. Levin further stated that "they also allowed loans that had been identified as fraudulent to be sold to buyers, again without alerting buyers when the fraud was discovered." Some of WaMu's fraudulent practices included manufacturing asset statements to submit to loan processing centers after the loans had already been funded. A year-long internal investigation found fraud rates of 58% and 83% in high-volume offices.

> or any other party involved in the origination or servicing of the mortgage loan).
>
> * * *
>
> All documents executed in connection with the Mortgage Loan ... are free of fraud and any misrepresentation ....

(Registration Statement at S-40 through S-41 and S-50).

73. Similarly, the June 27 Prospectus Supplement, defendant GSMC represented, that "all the documents executed in connection with the Mortgage Loan including, but not limited to, the mortgage note and the Mortgage, are free of fraud and any misrepresentation" (June 27 Prosp. Supp., p. S-71). It is further represented that "the Loan Seller has no knowledge of any circumstances or conditions with respect to the Mortgage Loan, the Mortgaged Property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent (with respect to substantially all of the Mortgage Loans), or adversely affect the value or marketability of the Mortgage Loan" (June 27 Prosp. Supp., p. S-75).

74. The foregoing statements were false and misleading because, as alleged above, borrowers and loan originators were systematically and routinely falsifying the incomes of the borrowers in order to qualify them for loans they could not otherwise qualify for or afford to pay. In addition, property appraisals were systematically inflated by appraisers who were being pressured by loan originators. The loan documentation also contained other misrepresentations understating borrowers' debts, and misrepresenting borrowers' employment status and the occupancy of the purchased properties. Defendant GSMC and the other defendants were aware of the misrepresentations and fraud in the loan documents prior to offering the Certificates for

sale. The Offering Documents represented that GSMC and GS Mortgage performed due diligence on the loans before purchasing them from originators and, thus, they and the other defendants became aware of the misrepresentations and omissions at that time.

*E. The LTV Ratios Stated in the Offering Documents Were False*

75. The Prospectus and Prospectus Supplements contained detailed, voluminous information concerning the LTV ratios of the loans within the Trust. Such information is very material to investors, as a lower LTV ratio indicates less risk with respect to the loans, while a higher LTV ratio indicates riskier loans. Information about the LTV ratios was spread throughout the Offering Documents. For example, the June 27 Prospectus Supplement for the Trust represented that "at origination, the weighted average loan-to-value ratio of the Mortgage Loans in Loan Group 1 was approximately 70.33%" while "the weighted average combined loan-to-value ratio of the Mortgage Loans in Loan Group 1 was approximately 73.60%" (at pages S-B-11 and S-B-12). With respect to Loan Group 2 loans, the Prospectus Supplement stated that "at origination, the weighted average loan-to-value ratio of the Mortgage Loans in Loan Group 2 was approximately 66.05%," while "the weighted average combined loan-to-value ratio of the Mortgage Loans in Loan Group 2 was approximately 66.92%," (at pages S-B-20 and S-B-21). The June 27 Prospectus Supplement further represented that approximately 2.48% of Loan Group 1 and approximately 1.87% of Loan Group 2 Mortgage Loans had LTV ratios in excess of 80% (see "Original Loan-to-Value Ratios" chart on pages S-B-11 and S-B-20).

76. The Prospectus Supplement for the Trust represented that no loan had an LTV ratio of greater than 95%. However, 72 out of the 1,414 loans in the total mortgage pool had original LTV ratios between 80% and 95%.

77. The Registration Statement stated that "the maximum loan-to-value ratio, including any second deeds of trust subordinate to [__________]'s first deed of trust, is 100%."

78. The Registration Statement also stated that exceptions to the maximum LTV ratio could be granted if the borrower's loan application reflected "compensating factors" such as "loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address." As detailed above, however, Defendants did not disclose that originators routinely violated the underwriting guidelines set forth in the Prospectus and Prospectus Supplements. Accordingly, the standards for making exceptions (i.e., the application of legitimate compensating factors) were also routinely disregarded.

79. The information regarding LTV ratios in the Offering Documents was inaccurate, false and misleading because LTV ratios were calculated using the false and inflated property appraisals, as described above. Incorporating an inflated appraisal values into the LTV calculations resulted in lower LTV ratios. For example, if a borrower seeks to borrow $180,000 to purchase a house worth $200,000, the LTV ratio is $180,000/$200,000 or 90%. If, however, the appraised value of the house is artificially increased to $240,000, the LTV ratio decreases to 75 % ($180,000/$240,000). Because an appraisal value of the property is needed to calculate the LTV ratio, and because the property values in the appraisals were inflated, this resulted in false, lower LTV ratios for the loans in the Trust. Thus, the LTV ratios, as represented in the Offering Documents, were understated while the actual (undisclosed) LTV ratios were much higher. The Offering Documents made it appear to investors that the Certificates were much safer and less risky than they actually were because a lower LTV ratio indicated there was more equity in the property, thereby protecting the loan holder in the event of a default or foreclosure, and making it

appear that borrowers would not likely default on the loans since they had equity in the properties.

### F. The Credit Ratings Assigned to the Certificates Falsely Portrayed The Certificates as Much Safer Investments Than They Really Were

80. The January 31, 2007 Registration Statement represented that the Certificates would receive "investment grade" ratings from Fitch Ratings ("Fitch") or Standard & Poors Rating Services ("S&P"). Eventually, all of the Certificates in the Trust were given "investment grade" ratings. For example, the Certificates for the Trust were all rated at "investment grade" — AAA to BBB — by Fitch in the Prospectus Supplement for the Certificates.

81. The Prospectus as the June 27 Prospectus Supplement stated that it was "a condition to the issuance" of the offered certificates that they receive certain, specified ratings from the ratings agencies (Prospectus, p. 126 and June 27 Prosp. Supp., p. S-148). The Prospectus also stated at page 126 that these ratings addressed "the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans or other assets. These ratings address the structural, legal and issuer-related aspects associated with such securities, the nature of the underlying mortgage loans or other assets and the credit quality of the guarantor, if any."

82. The Prospectus Supplement failed to disclose that the assigned ratings were not the result of the ratings agencies' independent analysis and conclusion. Rather, the ratings were pre-determined and, for virtually all tranches of the Certificates, were investment grade. If the rating agencies did not assign the specific, pre-determined ratings, the Certificates would not have been distributed to investors.

83. The Prospectus Supplement listed the initial ratings of the Certificates being offered in the Trust. The Certificates were rated as investment-grade, in accordance with the

pre-established rating systems utilized by the rating agencies. The Prospectus Supplement included the following information in a chart on the cover of the Prospectus Supplement, identifying the initial ratings of each tranche of Certificates:

| Class | Fitch | S&P |
|---|---|---|
| 1A-1 | AAA | AAA |
| 2A-1 | AAA | AAA |
| 2A-2 | AAA | AAA |
| 2A-3 | AAA | AAA |
| 2A-4 | AAA | AAA |
| 2A-5 | AAA | AAA |
| 2A-6 | AAA | AAA |
| 2A-7 | AAA | AAA |
| 2A-8 | AAA | AAA |
| 3A-1 | AAA | AAA |
| 3A-2 | AAA | AAA |
| 3A-3 | AAA | AAA |
| 3A-4 | AAA | AAA |
| 3A-5 | AAA | AAA |
| 3A-6 | AAA | AAA |
| 3A-7 | AAA | AAA |
| 3A-8 | AAA | AAA |
| 3A-9 | AAA | AAA |
| 3A-10 | AAA | AAA |
| 3A-11 | AAA | AAA |
| 4A-1 | AAA | AAA |
| 4A-2 | AAA | AAA |
| 5A-1 | AAA | AAA |
| 6A-1 | AAA | AAA |
| 7A-1 | AAA | AAA |
| A-P | AAA | AAA |
| A-X | AAA | AAA |
| M-1 | AA+ | NR |
| B-1 | AA | NR |
| B-2 | A | NR |
| B-3 | BBB | NR |

84. Certificates initially rated AAA were by far the largest component of the Trust, comprising approximately $770 million, or 97.4% of the total offering value. All the Certificates that Fitch initially rated "AAA" continued to be rated as investment grade instruments by Fitch until September 9, 2009, when they were downgraded to "CCC." All the Certificates that S&P

initially rated "AAA" continued to be rated as investment grade instruments by S&P until they were downgraded on August 21, 2009 to "CCC."

85. Information regarding the ratings, which defendants voluntarily included in the Offering Documents, was inaccurate, false and misleading because the ratings were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information. These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they actually were.

86. Further, Fitch and S&P used models to generate the ratings for the Certificates. The models were based upon loan performance prior to the year 2000. However, an unprecedented decline and deterioration in mortgage lending standards occurred after 2000 that the models did not account for. This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Fitch and S&P's pre-2000 loan performance data obsolete. Thus, by the time the agencies provided "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

87. Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, stated that credit rating modeling was not updated on a timely basis, despite the fact that by early 2004, S&P had developed, but never implemented, a ratings model that considered nearly 10 million loans and "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories." According to Mr. Raiter, a "consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products. As a result, expected loss estimates no longer provided the equity necessary to support the AAA bonds. This, in turn,

generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

88. Mr. Raiter stated that "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market."

89. In addition to using flawed models to generate ratings, Fitch and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business. This easing of ratings standards was due in large part to the fact that rating agencies like Fitch and S&P had a financial interest in generating favorable ratings. Fitch and S&P were compensated by the very entities, *i.e.*, the defendants, that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide Fitch and S&P with increased pressure to arrive at pre-determined ratings.

90. In addition to the eroding rating standards and the flawed rating models alleged above, Fitch and S&P's ratings were also based on inaccurate information. The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that defendants provided to them — including borrowers' incomes, property appraisal values and LTV ratios. As alleged above, this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein. Neither Fitch nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the loan pools they rated. Nor did they seek representations from defendants that due diligence was performed.

91. Because Fitch and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given "investment grade" ratings when in reality they were not of investment grade quality but actually were much riskier, "junk" grade investments. As such, the Offering Documents, which affirmatively set forth the false and misleading ratings, were themselves false and misleading.

**G. Defendants Did Not Disclose That at the Same Time They Were Selling the Certificates They Were Betting Against Loans Similar to Those in the Trust**

92. In December 2006, Goldman Sachs decided that it was becoming much too risky to own residential real estate mortgage loans similar to those in the Trust. Thus, in early 2007, defendants filed the Registration Statement with the SEC and began selling the Certificates to plaintiff and the Class. Defendants also simultaneously began making exotic bets against the housing market, betting that borrowers would default on the very same kinds of loans underlying the Certificates.[2]

93. Goldman Sachs engaged in "credit-default swaps," which were bets that residential mortgage borrowers would default on their loans — loans just like those in the Trust.

---

[2] In the recently filed *SEC v. Goldman, Sachs, & Co., and Fabrice Tourre*, 10 Civ. 3229 (BJ) (S.D.N.Y.), the SEC charged Goldman Sachs with fraud in structuring and marketing specific CDOs tied to subprime mortgages. Although the transaction at issue in the SEC's complaint is distinct from the transactions in which the Certificates were sold, there is a similar pattern in that Goldman Sachs mislead the investing public about the credit worthiness of the residential mortgages/loans that were pooled to form securities that Goldman Sachs marketed so that Goldman Sachs could make a significant profit while the investors would most assuredly suffer losses. Indeed, the SEC has warned that "the investigation is continuing into the practices of investment banks and others that purchased and securitized pools of subprime mortgages and the resecuritized CDO market with a focus on products structured and marketed in late 2006 and 2007 as the U.S. housing market was beginning to show sings of distress." SEC Litigation Release No. 21489 / April 16, 2010.

Defendants made these bets at the same time defendants were selling the purportedly "investment grade" Certificates to plaintiff and the Class.

94. Goldman Sachs also bet heavily against the housing market in early 2007 via a year-old subprime index on a private London swap exchange at the same time defendants were selling the Certificates to plaintiff and the Class.

95. Defendant Sparks, who was CEO of defendant GS Mortgage when the Certificates were sold, was also simultaneously overseeing Goldman Sachs' credit-default swaps and other bets against the housing market at the same time he signed the Registration Statement.

96. Defendants did not disclose, in violation of the 1933 Act, that they were engaged in such activities at the same time they were offering the Certificates to the investing public. Indeed, the Chairman and CEO of defendant Goldman Sachs, Lloyd Blankfein, subsequently admitted to the Financial Crisis Inquiry Commission on January 13, 2010, that defendants' conduct of selling the Certificates while simultaneously purchasing credit-default swaps was "improper." Defendants made absolutely no disclosure that they were actually then engaged in this activity in the Offering Documents for the Trust. Indeed, in light of their then-current engagement in such activities while simultaneously selling the Certificates, defendants' representations in the June 27 Prospectus Supplement that they "may" or might engage in such activity was itself a false and misleading statement.

## VI. DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

97. After the Certificates were issued, the ratings on nearly all of the Certificates within the Trust were downgraded. In some instances, Certificates that received the highest rating of AAA at issuance have fallen many notches and are now rated CCC — a rating many

levels below the threshold for "junk" status. In fact, the Certificates plaintiff purchased experienced just such downgrades.

98. Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which members of the Class can dispose of them in the secondary market for these Certificates. These diminutions in value and price have caused damages to the plaintiff and the Class. For example, plaintiff suffered a loss of $165,877.05 when it sold the security on October 5, 2009.

99. Defendant Goldman Sachs, however, fared much better. After selling the Certificates to plaintiff and the Class at inflated prices caused by defendants' misrepresentations, and pocketing a hefty profit, Goldman Sachs made tens of billions of dollars in additional profits on its undisclosed credit default swap bets it made against the loans underlying the Certificates. Plaintiff and the Class, on the other hand, have watched their Certificates plummet in value.

100. As a result of the untrue statements of material fact alleged above, plaintiff and the members of the class purchased Certificates that were fundamentally different economically than they were portrayed in the Offering Documents. The Offering Documents portrayed the Certificates as warranting ratings of AAA, with a low level of risk warranting only a 6% interest rate, based on the value and quality of the assets underlying the Certificates. In fact, the assets underlying the Certificates were less valuable and much riskier, warranting only "junk bond" status. Had the Offering Documents accurately disclosed the quality and risk of the Certificates' underlying assets, plaintiff and the members of the class would not have purchased Certificates, or would have purchased them only had they offered a substantially higher yield. Accordingly,

plaintiff and the members of the class are entitled to damages pursuant to the formulae set forth in Section 11(e) of the 1933 Act.

## COUNT I

### Violations of § 11 of the 1933 Act
### Against All Defendants

101. Plaintiff repeats and re-alleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

102. The Offering Documents for the Certificate offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. The untrue statements of material fact and omissions included, among other things: (i) the failure to disclose the loan originators' actual underwriting practices; (ii) the retention of biased appraisers who delivered appraisals in excess of the actual property value, which in turn distorted the reported LTV ratio; and (iii) the failure to prevent and remedy such improper and harmful actions that resulted in the decline of the Certificates' value.

103. Defendant GS Mortgage, as Issuer of the Certificates, is strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein, even if such misstatements and omissions were innocent.

104. Defendant Goldman Sachs was an underwriter of the offering and failed to perform adequate due diligence of each of the loan originators, thereby permitting the false and misleading statements and omissions included in the Registration Statement to be disseminated.

105. Defendant GSMC was the Sponsor and an underwriter of the Certificate offering and made misrepresentations and omissions in the Registration Statement as alleged herein.

106. The Individual Defendants signed the Registration Statement, which was false due to the misstatements and omissions described above.

107. None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

108. By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, § 11 of the 1933 Act.

109. Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement which was rendered false and misleading as a result of Defendants' misrepresentations and omissions. Plaintiff and the Class have sustained damages and are entitled to compensation as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' wrongdoing.

110. At the time of their purchase of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the middle of 2009 at which point credit agencies put negative watch labels on the Certificates and downgraded previously-assigned ratings.

111. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the initial complaint in this matter was filed.

112. Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the initial complaint was filed.

## COUNT II

### Violations of § 15 of the 1933 Act Against Defendants Goldman Sachs, GSMC and the Individual Defendants

113. Plaintiff repeats and re-alleges each and every allegation contained above. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

114. This Count is brought pursuant to § 15 of the 1933 Act against Goldman Sachs, GSMC and the Individual Defendants.

115. GSMC owns GS Mortgage, the Issuer of the Certificates. Goldman Sachs, in turn, owns GSMC. By virtue of their complete ownership of GS Mortgage, defendants Goldman Sachs and GSMC had the power to and did, direct GS Mortgage, and conducted and participated, directly and indirectly, in the conduct of the Trust's business affairs. Therefore, defendants Goldman Sachs and GSMC were control persons of GS Mortgage.

116. Each of the Individual Defendants was a control person of GS Mortgage and of the Trust by virtue of his or her position as a director and/or senior officer of GS Mortgage. The Individual Defendants at all relevant times participated in the operation and management of GS Mortgage, and conducted and participated, directly and indirectly, in the conduct of GS Mortgage and the Trust's business affairs. The Individual Defendants were responsible for the preparation and contents of the Registration Statement and signed the Registration Statement, which incorporated by reference the statements in the Prospectus and Prospectus Supplements.

The Individual Defendants were therefore "controlling persons" of GS Mortgage within the meaning of Section 15 of the Securities Act.

117. Defendants Goldman Sachs, GSMC and the Individual Defendants prepared, reviewed and/or caused the Registration Statement, Prospectus and Prospectus Supplements to be filed and disseminated. As officers and/or directors of GS Mortgage, the Individual Defendants had a duty to disseminate accurate and truthful information in the Offering Documents. As stated above, the Registration Statement, Prospectus and Prospectus Supplements contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

118. Thus, Goldman Sachs, GSMC and the Individual Defendants were each participants in the violations alleged herein, based on their ownership of GS Mortgage and their having prepared, signed or authorized the signing of the Registration Statement, the Prospectus and/or the Prospectus Supplements and having otherwise participated in the consummation of the offering detailed herein.

119. Plaintiff and other Class members purchased the Certificates issued by the Trust that were offered pursuant to the Offering Documents.

120. The Offering Documents, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.

121. Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Offering Documents.

122. Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Offering Documents, for which they are entitled to compensation.

123. Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the offering.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying plaintiff as Class representative;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 3, 2010

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

Lawrence P. Kolker
Rachel S. Poplock
270 Madison Avenue
New York, NY 10016
(212) 545-4600

KOHN, SWIFT & GRAF, PC
Joseph C. Kohn
Denis F. Sheils
William E. Hoese
Christina D. Saler
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

*Attorneys for Plaintiff The Police and Fire Retirement System of the City of Detroit*

**CERTIFICATION OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**

I, Walter Stampor, Executive Secretary of the Police and Fire Retirement System of the City of Detroit, hereby declare that:

1. I am authorized to make certification on behalf of the Police and Fire Retirement System of the City of Detroit ("PFRS").

2. I have reviewed the complaint prepared by counsel and have authorized its filing.

3. PFRS did not purchase the securities that are the subject of this action at the direction of the plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4. PFRS is willing to serve as representative party on behalf of a class, including providing testimony at deposition and trial if necessary. PFRS fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act regarding its options as to selection and retention of counsel and overseeing the prosecution of the action for the class.

5. During the proposed class period PFRS executed the following transactions in the GSR Mortgage Loan Trust 2007-4F mortgage-backed securities that are the subject of this action:

Transaction in Goldman Sachs GSR Mortgage Loan Trust 2007-4F

| **CUSIP NO.** | **Transaction** | **Date** | **Quantity** | **Purchase Price** |
|---|---|---|---|---|
| 362669AV5 | Purchase | 6/15/2007 | $1,800,000.00 | $1,785,337.50 |

| **CUSIP NO.** | **Transaction** | **Date** | **Quantity** | **Sale Price** |
|---|---|---|---|---|
| 362669AV5 | Sale | 10/5/2009 | $1,800,000.00 | $964,824.84 |

6. PFRS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> In re WSB Financial Group Securities Litigation, Case No. 07-cv-1747 (W.D. Wash.)
>
> In re SiRF Technology Holdings, Inc. Securities Litigation, Case No. 08-cv-856 (N.D.Cal.)
>
> City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al., Case No. 08-969 (D.Del.).

7. PFRS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

> In re Aetna, Inc. Securities Litigation, Case No. 07-cv-4451 (E.D. Pa.)
>
> In re Verifone Holdings, Inc. Securities Litigation, Case No. 07-cv-6140 (N.D.Cal.)
>
> In re UBS AG Securities Litigation, Case No. 07-cv-11225 (S.D.N.Y.)
>
> In re Societe Generale Securities Litigation, Case No. 08-cv-2495 (S.D.N.Y.)
>
> In re Gildan Active Wear Securities Litigation, Case No. 08-cv-5048 (S.D.N.Y.)

N.O. Employees Retirement System v. UBS AG, et. al., Case No. 09-cv-893 (S.D.N.Y.)

In re IndyMac Mortgage-Backed Securities Litigation, Case No. 09-cv-4583 (S.D.N.Y.)

In the foregoing cases, PFRS either withdrew its motion in deference to an institutional investor with a larger loss or an investor with a greater financial interest was chosen over PFRS to serve as lead plaintiff.

8. PFRS sought to serve as lead plaintiff and representative party in Southeastern Pennsylvania Transportation Authority v. Lehman Brothers Holdings, Inc. et al., Case No. 08-cv-2431 (N.D. Ill.), but withdrew its motion in favor of competing movants who were subsequently appointed Lead Plaintiff. PFRS is now serving as a named plaintiff and proposed representative party in the amended complaint in In re Lehman Brothers Equity/Debt Securities Litigation, Case No. 08-cv-5523 (S.D.N.Y.).

9. PFRS will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expenses, (including lost wages), directly related to representation of the class.

10. I declare under penalty of perjury that the foregoing is true and correct. Executed this 2 day of ~~May~~ JUNE, 2010

[signature]

Walter Stampor
Executive Secretary
Police and Fire Retirement System
of the City of Detroit

# EXHIBIT A

## SETTLEMENT AGREEMENT

The Attorney General of the Commonwealth of Massachusetts, Martha Coakley (the "Attorney General"), and Goldman, Sachs & Co., on behalf of itself and its affiliates Goldman Sachs Mortgage Company and GS Mortgage Securities Corp., have made and entered into this Settlement Agreement on May 7, 2009, in order to conclude and resolve all issues arising from the Attorney General's investigation described in Section B of this Settlement Agreement.

### A. Definitions

1. "CLTV" means combined loan to value ratio, defined as the ratio of the unpaid principal balance of the first lien loan and any second lien loan that may exist (as of the date of modification, refinance, or sale) to the then most current appraised value of the property.

2. "Interim Modification Rate" means the weekly Freddie Mac Primary Mortgage Market Survey ("PMMS") rate for 30-year fixed-rate conforming loans.

3. "First-Lien Massachusetts Loan" means a first-lien non-agency loan owned by the Goldman Sachs Mortgage Desk as of April 1, 2009 and secured by residential real property located in Massachusetts. These loans are identified in Exhibits A and B.

4. "Goldman Sachs" means collectively Goldman, Sachs & Co., Goldman Sachs Mortgage Company, and GS Mortgage Securities Corp.

5. "LTV" means the loan to value ratio, defined as the ratio of the unpaid principal balance of the loan (as of the date of modification, refinance, or sale) to the then most current appraised value of the property.

6. "Performing" means less than 60 days delinquent as of April 1, 2009 under the so-called Mortgage Bankers Association's calculation method.

7. "Second-Lien Massachusetts Loan" means a second-lien non-agency loan owned by the Goldman Sachs Mortgage Desk as of April 1, 2009 and secured by residential real property located in Massachusetts. These loans are identified in Exhibits C, D, and E.

8. "UPB" means the unpaid principal balance of the loan.

9. "Write Off" means that the loan is forgiven and the lien is released.

10. "Best Efforts" means activities performed in good faith to achieve the indicated outcome.

**B. The Attorney General's Investigation**

In late 2007, the Attorney General commenced an investigation into the financing, purchase, and securitization of allegedly unfair residential mortgage loans during the period through 2007. This ongoing investigation concerns:

a) whether securitizers may have facilitated the origination by others of "unfair" loans under Massachusetts law;

b) whether securitizers may have failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;

c) whether securitizers may have failed to take sufficient steps to avoid placing problem loans in securitization pools;

d) whether securitizers may have been aware of allegedly unfair or problem loans;

e) whether securitizers may have failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

f) whether securitizers may have failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

**C. Resolution**

The Attorney General and Goldman Sachs have agreed to resolve any and all concerns relating to Goldman Sachs arising from the Attorney General's investigation in accordance with the following terms and conditions:

1. Goldman Sachs will pay the Commonwealth $9.025 million by a check payable to the Commonwealth c/o Diana Hooley at the Office of the Attorney General, Insurance & Financial Services Division, One Ashburton Place, Room 1813, Boston, Massachusetts 02108. This check shall be provided to the Attorney General's Office within five (5) days of the date of this Settlement Agreement.

2. Goldman Sachs will provide $975,000 to the Office of the Attorney General pursuant to G.L. c. 12, sec. 4A. This payment shall be made by a check payable to the Office of the Attorney General, shall be delivered to the Office of the Attorney General, Insurance & Financial Services Division, c/o Diana Hooley, One Ashburton Place, Room 1813, Boston, Massachusetts 02108, shall be held in accordance with state

law, and shall be used prior to January 1, 2012 for administering the terms of this Settlement Agreement, monitoring Goldman Sachs's compliance with the terms of this Settlement Agreement, assisting in the implementation of the relief programs described in this Settlement Agreement, and supporting the Attorney General's continuing investigation of the financing, purchase, and securitization of allegedly unfair residential mortgage loans. This check shall be provided to the Attorney General's Office within five (5) days of the date of this Agreement.

3. For First-Lien Massachusetts Loans that are Performing, which are identified in Exhibit A, Goldman Sachs will provide an incentive for the borrower to obtain alternative financing, through lenders with Federal Housing Authority (FHA) and other lending programs, by forgiving in a refinancing (a) 25% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 96.5%, whichever reduction in UPB is smaller. Similarly, in order to facilitate an arm's length short sale, Goldman Sachs will offer to forgive in connection with an arm's length short sale (a) 25% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 96.5%, whichever reduction in UPB is smaller. If the borrower has a second lien loan on the property not owned by the Goldman Sachs Mortgage Desk, Goldman Sachs, on its own behalf or through its agents will, with the borrower's consent, contact the second lien lender and use its Best Efforts to facilitate principal forgiveness by the second lien lender to reduce the UPB of the second lien loan such that the CLTV of the loans is reduced in a refinancing or arm's length short sale to 96.5% (given the reduced UPBs of the first and second lien loans), subject to the limit on the reduction of UPB for the first lien loan of 25%.

4. For First-Lien Massachusetts Loans that are not Performing, which are identified in Exhibit B, Goldman Sachs will offer to forgive so much of the UPB as is necessary, up to 35% of the UPB, to facilitate a refinancing or arm's length short sale of the property. Goldman Sachs will instruct each relevant loan's servicer to forgo for six (6) months from the date of this Settlement Agreement taking steps to complete foreclosure with respect to any borrower who (i) makes good faith efforts to achieve a refinancing or arm's length short sale, and (ii) during the six-month period makes monthly payments at the Interim Modification Rate applied to the UPB of each first-lien loan reduced by (a) 30% of the UPB; or (b) so much of UPB as is sufficient to bring the LTV of the loan (using the most recent broker price opinion ("BPO") or appraisal obtained by Goldman Sachs) to 90%, whichever reduction in UPB is smaller. For any borrower seeking refinancing who makes six (6) consecutive monthly payments in the amounts defined in subsection (ii) of this Paragraph, Goldman Sachs will modify the terms of the loan to forgive (a) 30% of the UPB or (b) so much of the UPB as is sufficient to bring the LTV to 90%, whichever reduction is smaller.

5. For Second-Lien Massachusetts Loans that are Performing, which are identified in Exhibit C, Goldman Sachs will offer to forgive up to 50% of the UPB in exchange for full satisfaction of the remainder of the balance of the loan through payoff, refinancing, or arm's length short sale.

6. For Second-Lien Massachusetts Loans that are more than 180 days delinquent as of April 1, 2009, which are identified in Exhibit D, as well as the loans identified in Exhibit E, Goldman Sachs will Write Off the loans.

7. In order to determine the current LTV or CLTV of the property for purposes of calculating the principal forgiveness pursuant to this Settlement Agreement, other than for refinancings which are addressed in Paragraph 8 of Section C of this Settlement Agreement, Goldman Sachs, on its own behalf or through its agents, will obtain and pay the reasonable costs of a BPO or appraisal of the property by an independent third party, unless a BPO was obtained or an appraisal was performed on or after January 1, 2009.

8. Goldman Sachs, on its own behalf or through its agents, will pay reasonable closing costs up to 2% of UPB for any refinancing of any First-Lien Massachusetts Loan or Second-Lien Massachusetts Loan referred to in Paragraphs 3 through 5 of Section C of this Settlement Agreement. These closing costs will include the costs of any appraisal of the property necessary to achieve the refinancing referred to in Paragraphs 3 and 4 of Section C of this Settlement Agreement.

9. The offers in Paragraphs 3 and 5 of Section C of this Settlement Agreement will remain open until November 30, 2009. The offer in Paragraph 4 of Section C of this Settlement Agreement will remain open through the later of November 30, 2009 or the period during which the borrower is making the six consecutive payments provided for in the last sentence of Paragraph 4, but only for borrowers (i) who contact the servicer of the loan or Goldman Sachs in response to the communications provided for in Paragraph 10 of Section C of this Settlement Agreement and concerning such communications, but in no event later than one (1) week after the visit to the borrowers' residence provided for in Paragraph 10, and (ii) who meet the conditions in subsections (i) and (ii) of Paragraph 4.

10. Goldman Sachs will use its Best Efforts to cause the servicer of the loan to communicate the offers referred to in Paragraphs 3 through 6 of Section C of this Settlement Agreement in a letter to each borrower. With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers), Goldman Sachs will use its Best Efforts to cause the servicer of the loan to make at least five (5) telephone calls to the borrower in order to communicate the terms of the offer orally. With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers) within two (2) weeks of the date of the initial letter, Goldman Sachs will use its Best Efforts to cause the servicer of the loan to send a second letter to the borrower. With respect to each borrower who has not contacted the servicer or Goldman Sachs (concerning these offers) within three (3) weeks of the date of the initial letter, Goldman Sachs will use its Best Efforts to cause a representative of the servicer of the loan (or a contractor on the servicer's behalf) to visit the borrower's residence during a time of day reasonably calculated to find the borrower at home in order to communicate the terms of the offer to the borrower orally and in writing. For all loans serviced by its affiliate Litton Loan Servicing, LP ("Litton"), Goldman Sachs will cause Litton to

comply with the provisions of this Paragraph. For all loans serviced by a servicer other than Litton, if the servicer does not undertake to take the actions required by this Paragraph, Goldman Sachs, on its own behalf or through its agents, will take those actions.

11. Goldman Sachs agrees that Litton will hold sessions to meet with borrowers who have loans owned by Goldman Sachs or serviced by Litton to help qualified borrowers understand and take advantage of the offers in Paragraphs 3 through 6 of Section C of this Settlement Agreement or to develop other loss mitigation alternatives. Within two (2) months of the date of this Settlement Agreement, Litton will hold at least three (3) meetings for borrowers in at least three (3) different Massachusetts locations to be designated by the Attorney General within seven (7) days of the date of this Settlement Agreement. During or after these meetings, Litton will make available representatives to hold one-on-one sessions with borrowers. Litton will schedule each meeting at least three (3) weeks in advance of the meeting and will communicate the schedule in writing to borrowers.

12. The letter required in Paragraph 10 of Section C of this Settlement Agreement shall contain any information requested by the Attorney General and consistent with this Settlement Agreement, and shall be subject to the approval of the Attorney General. Drafts of the letters shall be submitted to the Attorney General within seven (7) days of the date of this Settlement Agreement. The Attorney General will provide her comments or approval within seven (7) days of receipt of draft letters from Goldman Sachs. Goldman Sachs shall cause the letters to be sent to borrowers within seven (7) days of mutual approval by Goldman Sachs and the Attorney General. The letters shall be sent by a delivery method that confirms the delivery, and Goldman Sachs shall provide confirmation of the delivery of all such letters to the Attorney General. Where such letters communicate an offer by Goldman Sachs, each letter shall include clear instructions for acceptance of the offer. All such letters shall also include a dedicated toll free telephone number that a borrower may call for advice, assistance and answers to questions concerning the terms set forth in the letter. Goldman Sachs shall cause a log of all calls received at such telephone number to be maintained and shall provide a copy of such log to the Attorney General.

13. Within five (5) days of the date of this Settlement Agreement, Goldman Sachs shall provide to the Attorney General a list of the borrowers eligible for each of the offers in Paragraphs 3 through 6 of Section C of this Settlement Agreement, along with, to the extent available:

a) the current UPB of each borrower's loan;

b) the current servicer of each borrower's loan;

c) the address of the property securing each borrower's loan;

d) the current lien status of each borrower's loan;

e) the current delinquency status of each borrower's loan;

f) to Goldman Sachs' knowledge, the most recent appraised value of the property securing each borrower's loan; and

g) the most recent telephone numbers and addresses for each borrower.

This information will be provided as part of the Attorney General's ongoing investigation under Massachusetts General Laws chapter 93A and will be subject to the confidentiality provisions of that chapter.

14. During the months June through December 2009, on the fifth business day of each month, Goldman Sachs will provide the Attorney General with a report that provides monthly and cumulative information concerning the refinancing referred to in Paragraphs 3 through 6 of Section C of this Settlement Agreement. Goldman Sachs will include in the monthly reports a description of all activities undertaken by Goldman Sachs that constitute Best Efforts under Paragraphs 3 and 10 of Section C of this Settlement Agreement.

## D. Ongoing Cooperation

1. Goldman Sachs agrees to provide reasonable cooperation to the Attorney General in the implementation of this Settlement Agreement.

2. Goldman Sachs agrees to provide reasonable cooperation to the Attorney General in connection with her continuing investigation into the origination, financing, purchase and securitization of allegedly unfair residential mortgage loans.

3. Goldman Sachs will comply with all reasonable requests by the Attorney General for documents or information related to the origination and securitization of residential mortgage loans, including but not limited to the sale of residential mortgage backed securities or derivatives referencing such securities to the Commonwealth and/or any political subdivision thereof. Goldman Sachs will provide such documents and information to the Attorney General within such time as the Attorney General and Goldman Sachs agree is reasonable.

4. Goldman Sachs will use its Best Efforts to make available current and former officers, directors, employees, and agents of Goldman Sachs for interviews by the Attorney General within such time as the Attorney General and Goldman Sachs agree is reasonable.

5. The Attorney General represents that her requests to Goldman Sachs pursuant to Paragraphs 3 and 4 above shall be made with due regard to the expense and inconvenience that Goldman Sachs will incur in complying with them, and will discuss with Goldman Sachs ways to reduce the expense and inconvenience of compliance. To the extent possible, Goldman Sachs will make the materials and/or persons requested

pursuant to Paragraphs 3 and 4 above available voluntarily and will provide all requested information that is not privileged. With respect to any document withheld or redacted on the ground of privilege, Goldman Sachs shall submit a written log indicating: (i) the type of document; (ii) the date of the document; (iii) the author and each recipient of the document; (iv) the general subject matter of the document; (v) the reason for withholding or redacting the document; and (vi) the Bates number or range of any redacted document. The Attorney General will return any privileged documents or information inadvertently provided to the Attorney General and later identified by Goldman Sachs as privileged. The Attorney General and Goldman Sachs will work cooperatively to resolve any legitimate confidentiality concerns related to requested information.

**E. Implementation**

1. Nothing contained herein shall be deemed to constitute an admission by Goldman Sachs of any wrongdoing in connection with any matter. Nor shall this Settlement Agreement or any negotiations, transactions, or proceedings connected in any way with this Settlement Agreement be offered or received in evidence in any proceeding to prove any liability, any wrongdoing, or an admission on the part of any party hereto, by any individual or entity not a party hereto; provided, however, that nothing herein shall prevent this Settlement Agreement from being used, offered, or received in evidence in any proceeding to enforce any or all of the terms of this Settlement Agreement.

2. The Attorney General will not seek further payments from Goldman Sachs or bring an enforcement action against Goldman Sachs related to the investigation described in Section B of this Settlement Agreement.

3. The persons executing this document represent and warrant that they have the full legal power, capacity, and authority to bind the parties for whom they are acting, and that this Settlement Agreement constitutes a legal, binding obligation of each party hereto, enforceable in accordance with its terms. Each person or attorney signing represents and warrants that he/she has obtained the authorization and direction of his/her clients to agree to all terms and provisions of this Settlement Agreement, and that his/her signature is affixed below with the full knowledge and understanding of his/her clients. Further, each party represents and warrants by its execution hereof that it has the right, power, legal capacity and authority to enter into and perform all of its obligations arising under this Settlement Agreement, including, as to Goldman, Sachs & Co., Goldman Sachs Mortgage Company, GS Mortgage Securities Corp., and the obligations of Litton Loan Servicing LP arising under this Settlement Agreement. Further, each party represents and warrants by its execution hereof that it has conferred with legal counsel of its choosing as to the significance and legal effect of this Settlement Agreement.

4. This Settlement Agreement constitutes the entire agreement among the parties with respect to the subject matter of this Settlement Agreement, and no prior oral or written statement concerning that subject matter shall have any force or effect, and shall not be relied upon to interpret this Settlement Agreement. No representations,

warranties, or inducements have been made by any party concerning this Settlement Agreement other than those contained and memorialized herein.

5. This Settlement Agreement shall be governed solely by the laws of the Commonwealth of Massachusetts.

6. This Settlement Agreement may be executed in signed counterparts, and the signatures in those signed counterparts may be delivered to the other party by fax or electronic means.

Signed: May 7, 2009

OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS

By:____________________
Name: Glenn Kaplan
Title: Assistant Attorney General

GOLDMAN, SACHS & CO. (on behalf of itself and its affiliates Goldman Sachs Mortgage Company and GS Mortgage Securities Corp.)

By:____________________
Name: Gregory K. Palm
Title: General Counsel