UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
THE POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT,
Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,     <u>OPINION</u>

-against-

                         10 Civ. 4429 (MGC)

GOLDMAN, SACHS & CO., GOLDMAN
SACHS MORTGAGE COMPANY, GS
MORTGAGE SECURITIES CORP., DANIEL
L. SPARKS, MICHELLE GILL, and
KEVIN GASVODA,

Defendants.

----------------------------------X
APPEARANCES:

        WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
        Attorneys for Plaintiff
        270 Madison Avenue
        New York, New York 10016

        By: Lawrence P. Kolker, Esq.
        Michael Liskow, Esq.

        KOHN, SWIFT & GRAF, PC
        Attorneys for Plaintiff
        One South Broad Street, Suite 2100
        Philadelphia, Pennsylvania 19107

        By: Joseph C. Kohn, Esq.
        Denis F. Sheils, Esq.
        William E. Hoese, Esq.
        Barbara L. Moyer, Esq.

        SULLIVAN & CROMWELL LLP
        Attorneys for Defendants
        125 Broad Street
        New York, New York 10042

By: Richard H. Klapper, Esq.
Theodore Edelman, Esq.
Michael T. Tomaino, Jr., Esq.
Matthew A. Peller, Esq.
D. Andrew Pietro, Esq.

**Cedarbaum, J.**

The Police and Fire Retirement System of the City of Detroit ("PFRS") sues Goldman, Sachs & Co. ("GS"), Goldman Sachs Mortgage Co. ("GSMC"), GS Mortgage Securities Corp ("GSM"), and three individuals (collectively, "Defendants") for violations of Sections 11 and 15 of the Securities Act of 1933.  Defendants move to dismiss the complaint on the grounds that it fails to plead economic loss, fails to allege any actionable misrepresentations, and is barred by the applicable statute of limitations.  For the reasons that follow, that motion is denied, except with respect to PFRS's claim that the offering documents misled investors as to the rating agencies' opinions.  PFRS also seeks leave to amend its complaint to add allegations regarding two additional trusts securitized by GSM.  That motion is denied as futile.

**BACKGROUND**

PFRS alleges as follows: On June 15, 2007, PFRS purchased Mortgage-Backed Certificates, Class 6A-1, from the GSR Mortgage Loan Trust 2007-4F (the "Trust") at a face value of $1,800,000.00.  GS served as an underwriter in the sale of the

certificates.  GSMC, a subsidiary of GS, purchased the loans underlying the certificates from a variety of originators and sponsored the offerings.  GSM, a subsidiary of GSMC, securitized the mortgages as the depositor of the certificates.  GSM issued over $790 million worth of certificates pursuant to the offering documents through the Trust.  The loans are divided into two groups.  Loan Group 1 had an aggregate scheduled principal balance of $707,936,373, and Loan Group 2 had an aggregate scheduled principal balance of $82,164,370.  The pool of loans underlying PFRSs' certificates was "Collateral Group 6."  80.6% of the loans in that group were originated by Countrywide Home Loans Servicing, LP ("Countrywide").  Other loan originators for the Trust as a whole included Washington Mutual Bank, Goldman Sachs Mortgage Conduit Program, SunTrust Mortgage Inc., and American Mortgage Network.  In mid-2009 the certificates were downgraded both by Fitch and S&P from AAA to CCC (i.e. "junk") status, allegedly destroying their value.

On December 11, 2008, NECA-IBEW Health & Welfare Fund ("NECA") filed a complaint against the defendants asserting violations of Sections 11, 12(a)(2), and 15 of the '33 Act. These claims included the 2007-4F Trust at issue here.  Counsel for NECA published a Private Securities Litigation Reform Act ("PSLRA") Notice in Business Wire on December 11, 2008, notifying purchasers of securities, including purchasers of the

2007-4F Trust, that a class action lawsuit had been filed on their behalf.  I dismissed NECA's claims pertaining to the 2007-4F Trust on January 28, 2010 for lack of standing.  On March 31, 2010, NECA filed a third amended complaint that no longer asserted claims regarding the Trust.  As its claims were no longer covered by the proposed class action, PFRS moved to intervene in the NECA action on April 26, 2010.  I denied the motion on May 27, 2010.  PFRS filed this action on June 3, 2010.

PFRS's complaint has been dismissed twice before with leave to amend, largely on the basis that PFRS had failed to allege that defendants' alleged misrepresentations caused injury to PFRS.  Since that time, however, the Second Circuit has issued an opinion in NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012), cert. denied, 133 S.Ct. 1624 (2013).  That opinion has significantly changed the landscape of the pleading standards for loss causation and is discussed below.

## DISCUSSION

### I.  Pleading Economic Loss

The absence of loss causation is an affirmative defense, and lack of loss causation is therefore generally "unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 n.7 (2d Cir. 2010).

PFRS now makes the following loss allegations:

1. It purchased its certificates (face value of $1.8 million) for $1,785,337.50 on June 15, 2007.

2. PFRS sold the certificates on October 5, 2009, for a (post-adjustment) price of $943,398.37.

3. The "book value" at that time was $1,109,275.41.

4. Thus, the difference between the book value and adjusted sale price constitutes its damages of $165,877.05.

The Second Circuit concluded in NECA that "it is not just plausible -- but obvious -- that mortgage-backed securities . . . would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain future cash flows" even if the securities did not miss an interest payment.  693 F.3d at 166. The court also concluded that the possibility that a secondary market for the certificates might not exist was irrelevant because, inter alia, that risk was a "liquidity risk" rather than the "credit risk" that led to the alleged loses.  Id. at 167.  The court ultimately found allegations that "a sale on the date the first lawsuit was filed would have resulted in a loss of at least 55 to 65 cents on each dollar amount purchased" sufficient to allege injury.  Id. at 155.

After NECA, the fact that PFRS (1) received payments throughout the life of the certificates, and (2) was arguably aware of the risk that there would not be a secondary market for

its certificates, is immaterial.  Defendants attempt to distinguish NECA by arguing that the PFRS complaint "does not adequately plead a decline in value as a result of any alleged misrepresentations," and does not adequately define "book value."  However PFRS's loss allegations are more detailed than NECA's, which pass muster under the governing case law.  Under NECA, PFRS has alleged a plausible injury.

Defendants also argue that PFRS has standing to bring claims only on behalf of plaintiffs who purchased certificates for the same tranche that it did.  However, Defendants concede, as they must, that this argument is precluded by NECA's holdings on "class standing" and simply maintain, for preservation purposes, that the holding was "in error."

## II.  Pleading Actionable Misrepresentations

Defendants next argue that PFRS does not plead any actionable misrepresentations.  PFRS must plead one of three bases for liability: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."  Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715–16 (2d Cir. 2011).  The complaint identifies several types of misstatements or omissions which are discussed below.

### A. Underwriting Guidelines

PFRS alleges that the offering documents misleadingly represented that the originating lenders applied certain underwriting standards when making the loans underlying the certificates.  In fact, according to PFRS, the lenders systematically failed to apply those standards.

Defendants argue that these allegations do not state a claim because the offering documents included warnings that many underlying loans had been issued "pursuant to alternative lending programs" that did not necessarily require verification of borrower-provided information.  PFRS alleges, however, that the practices of the originating lenders were "completely at odds with what defendants represented" in the offering documents.  For example, PFRS cites the following statement from the offering documents as misleading: "[T]he originating lender makes a determination about whether the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan."  The complaint alleges that in reality "the originators extended mortgages to borrowers without regard to their ability to pay their mortgage obligation" and that originators coached borrowers to falsely inflate their incomes and inflated those incomes themselves.

These allegations concern not only the documentation the
originators used, but also whether the originators sought in
good faith to ensure, with whatever information they were
provided, that the people to whom they lent were likely able to
pay.  Defendants' disclosures did not alert PFRS that this kind
of behavior could occur.  N.J. Carpenters Health Fund v. DLJ
Mortg. Capital, Inc., No. 08 Civ. 5653 (PAC), 2010 WL 1473288,
at *6 (S.D.N.Y. Mar. 29, 2010) ("DLJ") (cautionary language did
not "make clear the magnitude of the risk"); N.J. Carpenters
Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp.
2d 254, 270 (S.D.N.Y. 2010) ("[D]isclosures that described
lenient, but nonetheless existing guidelines about risky loan
collateral, would not lead a reasonable investor to conclude
that the mortgage originators could entirely disregard or ignore
those loan guidelines.") (internal citation omitted).

Defendants next assert that the underwriting policies were
simply "'guidelines' from which originators had discretion to
deviate."  However, as the Second Circuit has explained,
"'saying that exceptions occur' [in underwriting guidelines]
does not reveal what [PFRS} alleges, 'namely, a wholesale
abandonment of underwriting standards.'"  N.J. Carpenters Health
Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 125 (2d
Cir. 2013) ("N.J. Carpenters") (internal citation omitted).

Further, Defendants argue that the PFRS's claims are insufficient because the allegations regarding deviations from loan underwriting are not linked to the specific loans underlying the certificates. However, the Second Circuit has determined that somewhat similar allegations -- regarding widespread deviations in underwriting guidelines by the relevant underwriters, coupled with ratings downgrades and high delinquency rates in the loans held by the plaintiff -- can survive a motion to dismiss. N.J. Carpenters, 709 F.3d at 121-23. Although PFRS does not allege high delinquency rates in the loans, that distinction is not dispositive. Since the NECA court held that a ratings downgrade is a cognizable injury, whether PFRS was also injured through loan delinquencies is immaterial. PFRS has alleged that underwriters for loans in the Trust systematically abandoned their underwriting standards; it has adequately alleged that it was injured, and it has alleged that the misrepresentation and the injury are related. That is sufficient.

Finally, Defendants argue that under SEC Regulation AB, they are only required to disclose known deviations from stated underwriting guidelines and contend that the complaint did not offer sufficient support for the assertion that Defendants knew that the lenders were deviating from their underwriting guidelines. See Item 1111 of SEC Regulation AB, 17 C.F.R. §

229.1111(a)(3) (in relevant part requiring disclosure of "underwriting criteria used to originate . . . the pool assets, including to the extent known, any changes in such criteria"). However, Item 1111 can shield Defendants only with respect to omissions, not misstatements.  See Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012).  The PFRS complaint alleges that the description of underwriting standards contained in the offering documents was affirmatively misleading because the loan originators were not following these standards at all.  Regulation AB does not apply.  The allegations regarding deviations from underwriting practices are actionable.

**B. Appraisal Practices and Loan-to-Value Ratios**

The complaint alleges that representations regarding appraisal practices within the offering documents were misleading because "appraisers were ordered by loan originators to give pre-determined inflated appraisals that would result in approval of the loan" and in fact gave in to these demands. Further, PFRS alleges the loan-to-value ("LTV") ratios provided in the offering documents were false because they were based upon these inflated appraisals, which are used to determine the "value" used in the ratios.

As appraisals involve "subjective opinion based on the particular methods and assumptions the appraiser uses," they are

actionable only if the complaint "alleges that the speaker did not truly have the opinion at the time it was made public." Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).  While this is a difficult burden that many courts have found to be lacking, see, e.g., id.; DLJ, 2010 WL 1473288, at *7-8, allegations of such knowledge are nevertheless sufficient to survive a motion to dismiss.  Emps.' Ret. Sys. of Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141, 153 (S.D.N.Y. 2011) ("J.P. Morgan"); see also Fed. Hous. Fin. Agency., 858 F. Supp. 2d at 328.

PFRS's complaint comes closer to the latter decisions.  For instance, PFRS alleges that the appraisals underlying the Trust were not simply inflated, but that they were inflated because the appraisers succumbed to orders by loan originators to give inflated appraisals.  PFRS has met its burden.

Defendants finally argue that PFRS's allegations functionally allege fraud and that the allegations lack sufficient specificity to satisfy Rule 9(b).  Where claims are "premised on allegations of fraud," Rule 9(b) pleading standards apply even where fraud is not a necessary element of the cause of action.  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). The present allegations of knowing falsity by appraisers and loan originators do not amount to allegations of fraud by the

actual Defendants.  Although PFRS occasionally alleges knowledge of falsity by certain Defendants with respect to upholding underwriting standards, that knowledge is never an important part of the complaint, which explicitly disclaims that it is premised on fraud.  See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 503 (S.D.N.Y. 2004) (declining to apply Rombach where any allegations regarding defendants' scienter were not necessary to state claim under Section 11).

PFRS has stated a claim based on inflated appraisals and, as a result, has also stated a claim based on the LTV ratios that were based on those appraisals.

## C. Credit Ratings

PFRS alleges that the offering documents failed to disclose that the credit ratings assigned to the Trust "were not the result of the ratings agencies' independent analysis and conclusion."  The ratings were also allegedly inaccurate because they "were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information."

Credit ratings, like appraisals and LTV ratios, are opinions, and therefore a ratings agency must knowingly make a false statement in order for the opinion to be actionable.  See J.P. Morgan, 804 F. Supp. 2d at 154 (citing Tsereteli, 692 F. Supp. 2d at 395); DLJ, 2010 WL 1473288, at *7-8.  Unlike its appraisal allegations, PFRS does not clearly allege the ratings

12

agencies' knowledge of the ratings' falsity at the time they were made. Its allegations that ratings agencies "repeatedly eased their ratings standards in order to capture more market share of the ratings business," and quotation of a former S&P director who stated the credit ratings models had not been updated on a timely basis do not meet this threshold. Defendants' motion to dismiss this particular claim is granted.

### D. Truth of Underlying Loan Documents

The offering documents represented that the loan originators had warranted that the documentation of underlying loans was free from fraud.  PFRS alleges that these representations were misleading because the loan originators were systematically and routinely falsifying the incomes of the borrowers.  Further, it alleges that the loan documentation contained other misrepresentations understating borrowers' debts and misrepresenting borrowers' employment status and the occupancy of the purchased properties.  Defendants argue, citing to no pertinent authority, that the offering documents simply relayed statements made by the originators to Defendants and that those statements are therefore not actionable.

Even if these statements were initially made by the originators, Defendants echoed these representations to investors.  "If defendants were correct that a party could transform the Securities Act's strict liability regime into one

that required scienter simply by attributing factual information in the offering materials to a non-defendant third-party, th[e] purpose [of Section 11] would be significantly undermined." Fed. Hous. Fin. Agency, 858 F. Supp. 2d at 329.  PFRS has stated a claim based on the truth of the underlying loan documents.

### E. Adverse Investments

Finally, PFRS argues that GS should have disclosed its engagement in credit-default swaps because GS was simultaneously "betting that borrowers would default on the very same kinds of loans underlying the Certificates."  Defendants argue that they had no duty to disclose this information, and that their omission is therefore not actionable.  "A duty to disclose arises whenever secret information renders prior public statements materially misleading."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993).  It is difficult to perceive how an investor in the Trust would not find such information -- that the entity selling certificates was betting against those very same assets -- material.

Defendants also argue that the offering documents "expressly disclosed the possibility that Goldman Sachs could enter into credit default swaps" by stating that "[t]he Sponsor and its affiliates may from time to time have economic interest in the performance of the Mortgage Loans included in the Trust Fund or in other securitization trusts that may include a

residual interest, other classes of certificates, or interests in the form of derivatives."  Such a generalized disclosure that Defendants might have an "economic interest" in the Trust is not sufficient to place investors on notice that Defendants had already taken an <u>adverse</u> interest at the time the offering documents were issued.

### III. Statute of Limitations

#### A. When did the period begin to run?

Defendants argue that PFRS's claims are time-barred because PFRS was on notice of its claims more than one year prior to its initiating this suit on June 3, 2010.  Claims filed under Sections 11 and 15 of the Securities Act of 1933 must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.

In a case relating to the Exchange Act of 1934, the Supreme Court held that the limitations period does not begin to run until the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the violation.  <u>Merck & Co., Inc. v. Reynolds</u>, 599 U.S. 633, 653 (2010).  It is an open question in this circuit whether the <u>Merck</u> holding should be extended to the '33 Act or whether the stricter "inquiry notice" standard continues to apply.  <u>See Dodds v. Cigna Sec., Inc</u>., 12

F.3d 346, 350 (2d Cir. 1993) (limitations period begins if
"circumstances would suggest to an investor of ordinary
intelligence the probability that she has been defrauded," and
the investor does not make an inquiry at that time).  Under
either standard, the start date is the same: the date the NECA
complaint was filed on December 11, 2008.

PFRS contends that it was not put on notice until the
ratings downgrades of the certificates in 2009, but it is hard
to see how the filing of the NECA complaint, which included the
Trust, did not provide that notice.

Defendants for their part contend that news and litigation
regarding problems in the housing market, and concerning
Countywide in particular, put PFRS on inquiry notice much
earlier than the filing of the NECA complaint, especially since
some of these reports are included in PFRS's complaint.  Courts
considering similar situations have differed on whether (1)
public information on general problems with a loan originator is
sufficient to charge a party with inquiry notice and (2) the
question of notice can and should be answered at the motion to
dismiss stage.  Compare Pension Trust Fund for Operating Eng'rs
v. Mortg. Asset Securitization Transactions, Inc., No. Civ.A.
10-898 (CCC), 2012 WL 3113981, at *7 (D.N.J. July 31, 2012)
("The sheer volume of reports, articles, and lawsuits concerning
the mortgage lending industry and MBS available prior to

February of 2009 alone would be more than sufficient to put Plaintiff on inquiry notice of its claims"); with Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 480 (S.D.N.Y. 2010) (question of when inquiry notice arose is a factual question not suitable for a 12(b)(6) motion); and Pub. Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., No. 09 Civ. 1110 HB, 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) ("[P]ublicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators . . . does not 'relate directly' to the misrepresentations and omissions alleged in the [Second Amended Complaint].").

On balance, while it is conceivable that an investor of ordinary intelligence would have been put on notice of the violation PFRS alleges based on prior news and litigation, the material Defendants have submitted is not sufficient to warrant such a finding at this point.  The question of notice is a fact-intensive one that will be best resolved a later stage of this litigation.

Defendants also argue that the complaint fails to sufficiently "allege the time and circumstances of [the] discovery of the material misstatement or omission upon which his claim is based."  In re Direxion Shares ETF Trust, 279 F.R.D. 221, 231 (S.D.N.Y. 2012).  It is a close question whether

17

the complaint adequately alleges whether the ratings downgrades put PFRS on notice of its claims.  In this case, however, I have held that it is the earlier filing of the NECA complaint that put PFRS on notice.  Under the circumstances, there is no reason to compel PFRS to amend its complaint simply to incorporate this ruling.

Because PFRS was on notice of its claims not later than December 11, 2008 and because PFRS filed its complaint more than a year later, on June 3, 2010, PFRS must toll the one-year statute of limitations to proceed with this action.

### B. American Pipe Tolling

Relying on American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), PFRS argues that the statute of limitations was tolled from the filing of the NECA complaint to January 28, 2010, when I held that NECA lacked standing to assert claims based on, inter alia, the certificates in the Trust.  In American Pipe, the Supreme Court held that when class action status has been denied because of the putative classes' failure to fulfill the numerosity requirement, the limitations period should be tolled for any members of the putative class who then move to intervene on their own behalf.  Id. at 552-53.  The Court reasoned that a contrary rule would deprive class actions of the efficiency and economy of litigation that Rule 23 aims to achieve.  Id. at 553.

It remains an open question in this circuit whether _American Pipe_ applies when the class representative lacked standing to bring the claims on which another party now wants to sue.  _Compare N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc._, No. 08 Civ. 5653, 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010) ("[W]here a Plaintiff lacks standing—there is no case. And if there is no case, there can be no tolling"); _with In re Wachovia Equity Sec. Litig._, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011) ("[A]dditional Plaintiffs should not be punished for their failure to anticipate or timely remedy the standing deficiencies of the original . . . Complaint.").

The reasoning in _In re Wachovia_ is more persuasive.  First, there is no constitutional issue with applying _American Pipe_ tolling to the standing context because new plaintiffs would be "deemed by virtue of the invocation of Rule 23 to have commenced this action on the date the original complaint was filed."  _In re Morgan Stanley Mortg. Pass-Through Certificates Litig._, 810 F. Supp. 2d 650, 669 (S.D.N.Y. 2011).

Second, the same considerations of both efficiency and fairness support applying _American Pipe_ tolling to this context.  NECA issued a PSLRA Notice on the same day it filed its original complaint.  The Notice advised purchasers of the seventeen certificates on which NECA was suing, including PFRS, that a class action had been filed on their behalf.  PFRS should not be

punished because it did not anticipate that NECA lacked standing to sue on the 2007-4F certificates.  A contrary ruling would force putative class members to "make protective filings to preserve their claims in the event that those representatives were determined not to have standing," In re IndyMac Mortgage-Backed Sec. Litig., 793 F. Supp. 2d 637, 646 (S.D.N.Y. 2011), which "would breed needless duplication of motions" and "deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." American Pipe, 414 U.S. at 553-54.  Since American Pipe tolling is applicable here, PRFS's motion is timely.

## IV.  Section 15 Claims

Defendants argue that PFRS's Section 15 claims should be dismissed because there is no underlying Section 11 violation and because the complaint does not "adequately plead facts supporting an inference that Goldman Sachs or the individual defendants 'controlled' any of the alleged primary violators."

As I have ruled above, PFRS has adequately pled an underlying Section 11 violation.  As for control, PFRS alleges that each individual defendant was a director and/or senior officer of GSM and each signed the relevant registration statement.  This is sufficient.  See In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012).  GSMC is also a proper defendant for purposes

of Section 15 because GSMC owned GSM, which is potentially
liable under Section 11.

Defendants argue, however, that GSMC was dismissed in its
entirety following the first motion to dismiss.  Although the
written opinion could arguably be read that way, since it
granted Defendants' motion to dismiss "with respect to the
claims against [GSMC] in open court," the oral argument
transcript shows that GSMC was dismissed because it was not a
defendant within the confines of Section 11; there was no
discussion of Section 15.

**V. Motion to Amend**

The certificates for the new trusts (2007-8 and 2007-0A1)
that PFRS seeks to add to its complaint were issued to the
public in May of 2007 and July of 2007.  The motion to add these
new claims was made on December 26, 2012.  Unless the claims for
the new trusts relate back to the original PFRS action (filed
June 3, 2010), PFRS's amendment would be time barred under
Section 13's three-year cutoff, referred to as a "statute of
repose."  Even if relation-back applies, a claim regarding the
2007-OA1 certificates (issued on May 7, 2007) is still time-
barred if American Pipe tolling does not apply to the statute of
repose.

The Second Circuit has determined that American Pipe
tolling may not be used to toll the period of repose under

Section 13, and that a party intervening in a case may not use relation-back in order to press a claim that has otherwise expired under the statute of repose.  Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95 (2d Cir. 2013).  The court did not address a situation, like this one, in which plaintiffs seek to use relation-back to add new claims to their own complaint that would otherwise be barred by the statute of repose.  Nevertheless, the court's ruling controls here: the court rejected the idea that Rule 23 permitted tolling of the statute of repose because such a use of the rule would improperly "enlarge or modify a substantive right and violate the Rules Enabling Act."  Id. at 109.  Under the logic of IndyMac, permitting relation-back under Rule 15 would similarly violate the Rules Enabling Act.  Since PFRS can apply neither relation-back nor tolling to the statute of repose, both of its new claims are barred by the statute of repose as untimely.  Its motion to amend must therefore be denied as futile.

It is worth noting that Defendants also argue that Indymac precludes applying American Pipe tolling to the one-year statute of limitations where the original complaint was dismissed for lack of standing because of dicta contained in a footnote stating that "[w]here the named plaintiff's claim is one over which federal jurisdiction never attached, there can be no class action."  Indymac, 721 F.3d at 111 n.21 (quoting Crosby v.

Bowater Inc. Ret. Plan for Salaries Employees of Great N. Paper, Inc., 382 F.3d 587, 597 (6th Cir. 2004) citing Walters v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998))).

However, "Indymac never decided whether American Pipe tolling applied despite the initial plaintiff's lack of standing because it found that American Pipe tolling does not apply to Section 13's statute of repose under any circumstances." Monroe County Emps.' Ret. Sys. v. YPF Sociedad Anonima, No. 13 Civ. 842 (SAS), 2013 WL 5548833, at *1 (S.D.N.Y. Oct. 8, 2013). Crosby and Walters suggest at most that it would have been impermissible to permit PFRS to intervene in NECA's action once the portions of NECA's claim encompassing the Trust had been dismissed for lack of standing. Neither case concerns American Pipe tolling. As the Indymac court itself acknowledged, while a statute of repose affects a plaintiff's underlying right, a statute of limitations simply "limit[s] the availability of remedies." 721 F.3d at 107. Tolling the statute of limitations here does not impermissibly revive an action for which there was no standing. It simply affects whether PFRS, which clearly has standing to pursue this action, has a remedy for the violations it has alleged.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied, except with respect to PFRS's claim that the offering

documents misled investors as to the rating agencies' opinions,
for which the motion is granted.  PFRS's motion to amend is
denied.

     SO ORDERED.

Dated:     New York, New York
             March 27, 2014


     S/_____
          MIRIAM GOLDMAN CEDARBAUM
        United States District Judge